Good morning, Your Honors. May it please the Court, Jenna Beyer from the San Francisco Public Defender's Office, appearing on behalf of Petitioner. I'd like to reserve five minutes for rebuttal. Can I ask you something just right off the bat? I got to say, I was a little offended by the request to use a pseudonym on the very eve of oral argument. This case has been going on for a long time. You've known about the issue for a long time, and all you ended up doing was by basically re-arguing the same things you'd done before without giving the other side an opportunity to respond. Why was this filed so late? Your Honor, we did approach the opposing counsel regarding the motion to proceed under pseudonym, and they did not oppose. I understand that, but I'm talking about the timing. Certainly, Your Honor. This was something that we discussed with our client close to the oral argument because the pleadings in this case are not made public. Unless someone is interested in seeing them, they can come to the Court and request them specifically, whereas a memorandum disposition or a published opinion is very easily accessible by the public, and that is what raised concern for the Petitioner. Again, and you know this well, the BIA's opinion is available. The IJ's opinion is available. If they go on Google or whatever, there are just all kinds of things out there other than the final disposition. Now, I understand the general point, but I just thought, wow, these are professionals. Why are we getting at this at this late time in the case? The issue's been there all along, right? Certainly, Your Honor. I apologize for that. It's not without precedent, however, to request proceeding under pseudonym this late. I would point, Your Honors, to B.R. v. Garland, another case argued by my colleagues at the Public Defender's Office, in which the proceeding under pseudonym was requested after the opinion was published. And here we think that having the decision made available on the website, whether it's published or in a memorandum disposition form, will put the Petitioner at greater risk both in Mexico and also in his circumstances in detention. Thanks for mentioning that. I apologize for starting right off this way, but it kind of stuck in my craw a little bit, so I thought I would express that. I apologize, Your Honor. We are here because the IJ refused to accord potentially dispositive expert testimony, no weight, in Petitioner's Convention Against Torture claim. If we decide based on that claim, should we or can we reach any of the other evidentiary issues? So on the expert opinion issue, can we get to any of the other issues if that's a basis for granting? If the Court agrees with me that the IJ erroneously disregarded the expert testimony, no, I think the Court need not reach the ultimate determination as to whether the Petitioner is likely to suffer torture in Mexico. Just to pull that piece apart as I take it and let me know whether I'm in the ballpark here, there are two different considerations. There's expert opinion testimony, which the judge discounted or accorded no weight to. And then there's also what we might call generalized country condition factual evidence that they testified to. How do we parse those two with respect to, I mean, do we have to take the expert's testimony as a bunch and send them back for reconsideration of the whole testimony, or is the opinion a separate ground than the fact evidence? Your Honor, we think the IJ erred both in according no weight to the expert's ultimate conclusions and also to considering record evidence, including the Department of State report, including Petitioner's credible testimony about his fear. And so we would ask this Court to remand for full and fair consideration of all of the evidence as a whole and to accord the expert's testimony full weight. Both opinion and fact evidence? Because I think there's kind of separate lines of cases with respect to the opinion and the fact. Yes, that's right, Your Honor. The IJ in this case plainly stated that he was giving no weight to the expert's predictive testimony as to my client's likelihood of torture or death in Mexico, and also he made factual conclusions that are directly at odds with the expert's testimony on the mechanics of cartel violence in Mexico. I've got two separate questions, so let me focus on the expert's testimony first. The IJ said, look, I think your facts are all right, but I don't buy your opinions, right? He asserts that he is accepting the facts. I'm accepting your facts, but I don't buy your opinions. You're not suggesting that Finder of Fact must accept the opinions of an expert if he accepts his underlying facts, are you? No, Your Honor. This Court in Velasquez-Samayoa pointed to multiple ways in which the agency could potentially So, okay, good. So your point is not that he was required to accept the expert's opinion. You don't think he gave good enough reasons for not accepting, for rejecting it? That's exactly correct, Your Honor. In Velasquez-Samayoa, this Court laid out several possibilities. So one would be the agency points to countervailing record evidence that directly contradicts Right. And now that's not good. Now you're really engaging on the point I wanted. The IJ doesn't say, well, I'm looking at the other evidence that contradicts your report, and So my question is, how specific does he have to be in rejecting the opinion? In other words, if he had done what your able opponent did here in her brief and said, here's all the reasons I reject this opinion, there's lots of contrary evidence and it leads me to different conclusions and nice thanks for your opinion, but I find as a preponderance of the evidence, the evidence weighs the other way. You wouldn't have a problem, would you? It depends on the specific reasons that the immigration judge gave. So how about the reasons cited by the government in its brief? Are they good enough? Certainly, if there's contradicting evidence or you would expect for a premise that the expert relied upon to be corroborated by other evidence and it was not, that would be sufficient to potentially accord reduced weight to an expert testimony, but that's not what happened here. Okay. Now I wanted to ask you a different question, and it deals with this is a CAD case. Correct. I put aside the waiver of inadmissibility for the moment, and so you have to establish a probability of torture by the government or with its acquiescence. I'm having trouble finding in the expert's testimony anything that, there's lots of stuff that establishes that the government may be corrupt, but I'm having difficulty finding in the expert's testimony or in any testimony in the record, anything that establishes a probability that your client will be tortured with government consent or acquiescence. Can you help me out? Absolutely, Your Honor. Dr. Slack testifies that police are often directly involved in kidnapping and lynching on behalf of cartels. But what does that make it more probable than not that your client will be tortured? He testifies that the lynching of suspected pedophiles is commonplace, occurs quite frequently, and is well documented across multiple states in Mexico. And I would also point, Your Honor, to Dr. Slack's ultimate conclusion, which is that he is at extreme risk of egregious physical harm or death in Mexico. And that is grounded in his decades of research and experience on the patterns of violence against deportees in Mexico. Let me see if I can carve a little piece of this out. I gather you would not claim that if the expert's opinion went contrary to our case law, that the IJ would somehow be bound with that, right? Correct. For example, the Americanization issue. That wasn't talked about, but we've got several cases that say that's not a PSG. Delgado-Ortiz said that Mexico's returning home from the Munoz versus Lynch. We held that no imputed wealthy Americans being a discrete class of persons that we recognize. So from my perspective, the whole Americanization issue just kind of goes out the window. Whatever he thought about it, that's not a PSG. We've found that. So what we're dealing with then is the role of the expert, which my colleague has talked about. You're a wonderful lawyer. You know how it is. You go to a trial court and you say to the trial court, I'd like to bring in an expert to assume your job. I want this expert to come in and tell you what the facts are and what the law is, and you've got to accept it. The judge would say, are you kidding me? That's not the role of an expert. You have a specific thing that you can show your expert in that may help the court, but you're not the decider. I'm the decider. And that's really what happened here, right? The immigration judge said, hey, appreciate this information. As I look at this, you've given me no background to basically bring this down to a real term. We talk about the countrywide thing, but what about the issue that faces this particular petitioner? Why isn't it perfectly appropriate for the IJ to basically say, hey, thanks for your testimony. I'm the decider of the fact. I'm the decider of the law. I heard two parts to that question, Your Honor. The first regarding Americanized deportees. This is a cat claim, Your Honor, so there is no need for the petitioner to establish that he's a member of a particular social group. That just simply is not applicable. And the evidence demonstrates that those who are Americanized and have American cultural characteristics are more likely to be at risk of arrest, more likely to be at risk of kidnapping. So that's my point number one. My second point on whether the expert is essentially supplanting the trier of fact is that this court has given the agency multiple ways in valid to discount an expert's testimony, but the IJ did neither of those things here. The two ways that this court points out in Velasquez-Samoa, if there's contradictory evidence or if you would expect the testimony to be corroborated, but was not. Here what we have is the IJ faulting the petitioner for an alleged failure to present statistical evidence. And these are statistics that simply do not exist, and so to require data that does not exist renders cat relief essentially illusory. We think this court should say so and remand. Okay. Do you want to save any of your time for rebuttal? I would. Okay. Thank you. Very well. Let's hear from the government. It's been a long day. May it please the court, Alana Young for the Attorney General. I'll turn right into the expert witness issue because that is where the court's interest lies. I think it's important in this case to, there's a lot of nuance in this case, and I think it's important to look at the entirety of the IJ's decision. The IJ does, in the government's opinion, does a very good job of looking at all the evidence presented, and that includes the evidence presented by Professor Slack. If this court goes through each section of the IJ's decision, this court will see that the immigration judge did say, for example, Professor Slack opined that it would be extremely dangerous for the Respondent to live in Jengapayo. Throughout his decision, the IJ made those determinations. Consider Professor Slack's testimony with regards to the factual background and with regards to the likelihood. Why shouldn't we take the IJ at face value, though, in saying that I'm according to expert testimony, opinion testimony, no wait, and here's why? I mean, how do we not credit that? This court should credit that, and I think that's important because where the immigration judge made that determination, and excuse me, I will read from this part of the immigration judge's decision. Can you just let us know, give us a site so we can follow along? We're on AR 106. The court accepts the factual background information provided by Slack. However, the court does not afford any weight to Slack's opinion as to the likelihood of The immigration judge goes on to explain why, but I'd like to point the court to the last sentence, that very last sentence. Thus, while the court accepts the factual information that Slack has provided based on his research, the probability assessment on issues such as the likelihood of harm or danger cannot be provided weight, as there is no statistical information to place such predictions in context. Well, and that's, you've focused on exactly the right sentence. That is, and that's where I think the, I think that's the distinction that makes all the difference, Your Honor. Well, but let me just, let me just push back on you a little bit. Yes. I understand that a finder of fact is entitled to say, you're an expert, I agree all your predicate facts are correct, I disagree with your conclusions. The reason that the I.J. here disagrees with the conclusions is that there's no statistical evidence to support his conclusion that it's more probable than not, or that it's extremely likely. And the other side says, there's a good reason for that, no such statistics exist. And so can you fault somebody for not having statistics that don't exist? Yes and no, in a sense, Your Honor, because Professor Slack's, Professor Slack's research is based on ethnography. And so he did go out into fields, spend time with deportees, and he was asked by DHS counsel, what statistics are you creating? And he answered, well, I created statistics about general information about experiences of deportees. And then DHS counsel proceeds to ask, well, what about, can you say the percentage of people with tattoos returning, what their experiences are? Well, it's hard, it's a challenge. What about your experience with like deportees? What happens with them after they go to the shelter? Well, it's hard because we can't follow up. Sometimes they, they disappear, they go back to the U.S. So based on Professor Slack's own testimony, the immigration judge, that's where the immigration judge was hesitant in providing that information. Well, realistically, in a cat claim, isn't the very law that we're dealing with a probability analysis? I mean, the law says it's more likely than not. That's probability, is it not? It is probability, but it's, it's probability, but it's also a qualitative analysis, in this case, because we have aggregation. So that's what, if the IJ decided that to help decide the likelihood of torture, he was entitled to consider, if you will, mathematical calculation to help him determine that? Yes. What's wrong with that? There is nothing wrong with that, Your Honor. He is entitled. He, he could have done that, and I think what, because that information was not available, he relied on other information provided in the record. Okay, so what other information, because I think our case law is relatively clear that, setting aside according the expert no wait, what's the other information that came in to allow him to draw the conclusion that it was not more likely than not? Because it doesn't appear opposed. I, I don't see, where's the evidence on the other side of Professor Slack's expert opinion? The other, Your Honor, I, I don't mean to be, in any way make a joke out of this, but the, the Petitioner bore the burden of proof before the immigration judge, and he didn't provide specific persuasive and specific evidence to show that the he more likely than not would be tortured. Well, not after the IJ says they're giving it no wait, but that's exactly the question. I, I think, I think the, right, the, the argument here is the Petitioner put forward evidence, qualitative evidence, that went to likelihood. What's the evidence that came in on the other side? So there's no wait on this side. What's the evidence that the IJ relied upon to reach the conclusion as to probability then? There is, the other evidence is Petitioner's testimony, the statements, and the country condition evidence. If we parse out the various theories that Petitioner put forth, and I think that's important here, that we look at the sources of torture, as this court has provided for aggregation analysis, the sources of torture and the theories of torture. And so what the immigration judge here did is looked at the theories of torture for, for example, the tattoos, and indicated, well, this is speculative. So even though Professor Slack provided that, oh, he would be extreme, he would be, could be in danger if he, because of his tattoos, Petitioner did not provide other evidence establishing that each chain of the, in the hypothetical chain of events would occur. Why wouldn't that then amplify the impact of the error if there were an error? Basically, I think you're saying that once Dr. Slack's testimony was out, the Petitioner's case was zeroed out. We essentially have no evidence on his side. But I guess I'm still, what's the evidence on the other side that, I mean, I get the burden of proof, but, but it seems even more serious if the IJ is lending no weight to Petitioner's central evidence. What's the thing on the other side that says, oh, he'll be okay? But it's not the immigration, excuse me to push back, Your Honor, but it's not that the immigration judge completely disregarded Professor Slack's testimony. It's only in that particular area with the prediction of more likely or not in torture. The immigration looked at all the other aspects of Petitioner's claim and took into account Professor Slack's testimony and all the other evidence in record. But he said, he said no weight, and this is what I think we're, we're all, we're all trying to deal with. The, the only thing that supports Petitioner's case in Professor Slack's testimony is his eventual opinion that all these facts lead me to think that it's more probable than not that he'll be tortured if he goes back to Mexico. I mean, all those other facts don't, don't meet the Petitioner's burden of meeting, showing that it's more probable than not. And it is his burden. It is his burden. So, so, and so he, he seeks to meet that burden with the opinion of his expert, not just the facts, but with the opinion of his expert. And I could see an IJ saying, yeah, I have your opinion, but it's not persuasive for certain reasons, or I have your opinion, but other record evidence cuts the other way. But here, I think all the IJ said was, I give no weight to this opinion at all. And that's essentially saying I'm rejecting the opinion, correct? No. Yeah, he's, he's, he doesn't reject his facts, but he says, I give no weight to your opinion. That seems to me to be the rough equivalent of a rejection of an opinion. And our cases say in order to reject an expert's opinion, one must do certain things. So if I'm, you can push back on my premise, but my, answer my last question first. If I'm right about the premise, how, how did the IJ follow our instructions about how one proceeds to reject the expert opinion? Yes, Your Honor. Assuming that you're right on your premise, I do think the immigration judge provided a reason for why the immigration judge gave no weight to that part, that, that particular part of Professor Slack's testimony. And the reason why is that the foundation for the more likely than, hood than not opinion by Dr. Slack was lacking. As I mentioned before, when Professor Slack was asked about what do you think? Because it had, because of the absence of statistics. It wasn't, it's not just the absence of the specific, but he himself provided the limitations of his knowledge. Reading thoroughly, reading the exchange between DHS and Professor Slack, Professor Slack was quite honest about his process and whom he talked to and the limitations of his knowledge and what the foundation of his knowledge and his opinion about Ms. Petitioner's And we, in our analysis, would have to consider the colloquy between the professor, DHS, where he's basically saying, I can't, you know, I have nothing to back that up. I have nothing to back that up. And I, the IJ ultimately concludes, hey, you know what? You're, you're making a prognostication. It's a calculation. And without further evidence that he described as basically mathematical evidence, probability, he was not crediting it. Is that basically what happened from your perspective? Yes, it is, Your Honor. I also like to point out like other, there is, there is statistical evidence in the record. The 2020 Human Rights Report has a bunch of data. And I think the immigration judge was rightly, given all the, there is a lot of country condition evidence in the record. And I think the immigration judge did, did a fine job of going through all the evidence in the record. And, and I think appropriately weighed Professor Slack's opinion. Well, see, my problem is he didn't weigh it at all, or at least my concern is. If he'd said, I have your opinion, Professor. It's a fine opinion. But I've looked at the country conditions evidence. And your opinion is contrary to the country conditions evidence. And therefore, I don't find that Petitioner has carried his burden of establishing a probability of torture. I'd have very little difficulty with his case. What causes me the difficulty is I offer, I, I afford your opinion no weight. Which, and this was my premise before, which I'd like you to attack if you can. Yes. Which is that affording it no weight is really the equivalent of rejecting it. Your Honor, affording it no weight means that the immigration judge considered what weight to give it and decided to give it no weight. Well, and then, I, so I guess I, I don't see how that squares with Velasquez-Samoa then. I, I don't think he's, I don't read the IJ as setting up a, right, I mean the weighing of saying there's conflicting evidence here. I, I think, I guess the concern is why, why isn't he making the same error the IJ made in Velasquez-Samoa bias? And, well, there's not corroboration there. What else is a petitioner supposed to show other than that lynchings of similarly situated people are commonplace to establish torture on these grounds? This case is distinguishable from, to your point about Velasquez, Your Honor, this case is distinguishable because Velasquez focused on rejecting the board. The board in that case rejected the immigration judge, rejected the expert's opinion because the board wanted corroboration and said, like, well, here we have this expert opinion, but we need corroborating evidence for this expert opinion. That's not what happened here, Your Honor. Excuse me. He doesn't even say that. No. Velasquez- There's, there's no, there's no corroboration, but the IJ also doesn't say there's conflicting evidence. Well, here we're not, well, my point is Velasquez is not, this is not the factual scenario of Velasquez. In this case, we're not talking about corroboration. We're talking about foundation. We're talking about foundation for Professor Slack's opinion of why a petitioner would more likely than not be tortured. And because of that, because of that, and that's the distinction I think that makes the difference from Velasquez. We're not talking about, we want other evidence to corroborate Professor Slack's testimony. We want foundation for how Professor Slack reached his prediction, and that's the part where the immigration judge had issues with, based on Professor Slack's own testimony. There was also, in the country report, there was some statistical, if you will, evidence as well, as well as the colloquy back and forth between DHS and Dr. Slack, where there was, it was clear he didn't have much of a foundation. Now, the IJ may not have been as articulate as he should have been in saying how he weighted, but instead of just saying he rejected it, which is not my view, he just took all of this into consideration and concluded that as to that part of his report, he gave it no weight. That's exactly it, Your Honor, and that's, as the immigration judge, he's the trier of fact, and Professor Slack's opinion is just that. It's an opinion, it has evidence, it is evidence like all other evidence in the record, and the immigration judge has the trier of fact. Yeah, this is not, this is not a claim as we had in a prior case, that the IJ overlooked important evidence and didn't deal with it. The question is whether he dealt with it appropriately. Yes, Your Honor, the government's position is that he did. Unless the court has any other questions. Other questions? I think not. All right. The government is on the case. And now for the finale, the wind-up. Your Honors, Dr. Slack did provide statistical context for his analysis. Since 2007, he's been conducting post-deportation surveys with thousands of individuals to identify patterns of individuals who are most vulnerable to cartel violence. What's your response to the colloquy between DHS and him, where he basically was unable to provide any statistical backup? Dr. Slack goes to great pains to explain the inadequacy of data on criminal behavior in Mexico, which is corroborated by the country conditions evidence. The Department of State report says that 94% of crimes are unreported in Mexico. The Congressional Research Service says that an estimated less than 10% of torture from security forces is reported. And that's in the country conditions reports in the record. Correct. Yes. So I guess I wonder, is there a distinction, taking your friend's position, is there a lack of foundation going into the testimony, and according to the resulting testimony, no weight? Can't IJs make determinations like that, that I'm making a judgment that there's no foundation? Or is that the same as, is it infected with the same error under Velasquez-Samoa as of according to no weight? If the IJ were to find that this lacked foundation, then I believe the IJ should have said, this person is not qualified as an expert in violence against deportees in Mexico. And the IJ finds the expert credible? Correct. Credible. DHS does not dispute this expert's foundation at all. But the expert, nobody disputes the expert's foundation. Nobody disputes his expertise. But his ultimate opinion, that it's more probable than not that your client will be tortured, is entitled to be questioned by the IJ. And the IJ says, I don't know how you can conclude it's more probable than not, because you've got no, that's a statistical analysis, as Judge Smith says. And so I can't give that opinion any weight because you don't have, you haven't given me a basis for crediting it. What's wrong with that? Well, as a factual matter, Your Honor, as I mentioned, he does provide statistical context for his prediction. I read all this testimony. I can't, I mean, the truth is, he can't really testify whether it's more probable than not that your client will be tortured on return to Mexico. All he can do is opine whether it's more probable than not that somebody with your client's characteristics would be tortured. And I'm not even sure he says that. How does he say that? He just says, people of this nature are of extreme risk of violence. I don't know whether extreme is more probable than not, less probable than not, very probable. I mean, isn't that what the IJ was saying at the end? The IJ, it's hard to put myself in the position of the IJ, but he gave no weight to the expert conclusions. But I would also point out that the IJ gives no weight and comes to contrary the attention of the cartels, why the cartels might be interested in them, if they're a newcomer to a certain area, the prevalence of lynchings, as Your Honor pointed out. And the IJ completely disregards all of this factual background, which the IJ says that he accepts, and comes to conclusions that are directly contrary without pointing to any countervailing evidence. So it's essentially as though the entire opinion of the expert is ignored. Another question? We know we could talk a lot longer. We thank you both for your very helpful argument. The case just argued is submitted and the court stands adjourned for the day.
judges: SMITH, HURWITZ, JOHNSTONE